Clerk, U.S. District Court
Southern District of Texas
FILED

SEP 17 2014

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | |
| APPLICATION OF THE UNITED | § | |
| STATES OF AMERICA FOR AN | § | Case No. 2:07mc127 |
| ORDER: (1) AUTHORIZING THE | § | |
| INSTALLATION AND USE | § | |
| OF A PEN REGISTER AND TRAP | § | |
| AND TRACE DEVICE; | § | |
| (2) AUTHORIZING RELEASE | § | (UNDER SEAL) |
| OF SUBSCRIBER AND OTHER | § | |
| INFORMATION; AND, | § | |
| (3) AUTHORIZING THE DISCLOSURE | § | |
| OF LOCATION-BASED SERVICES | § | |

United States District Court
Southern District of Texas
FILED

OCT 30 2007

Michael N. Milby, Clerk of Court

## AFFIDAVIT IN SUPPORT OF APPLICATION

1. I, Patrick Hartig, am a Special Agent with the Drug Enforcement Administration and, as such, I am charged with enforcing all laws in all jurisdictions of the United States, its territories and possessions. My primary duty and assignment obligates me to investigate violations of Title 21 of the United States Code. I have been involved in numerous investigations concerning the organized domestic and international importation and distribution of multi-kilogram quantities of cocaine, heroin, methamphetamine and ton quantities of marijuana. Those investigations have resulted in the arrest and dismantling of various distribution, transportation, and supply groups

based in Mexico and operating in the states of Texas, Florida, Georgia, New Jersey, New York, North Carolina, Illinois, and elsewhere. In the past year, I have received authorization from the court on several occasions to initiate pen registers and utilize mobile tracking devices to locate and identify drug traffickers. Within the last two years, I have also received authorization to intercept the wire communications of drug traffickers, which has resulted in the seizure of large quantities of narcotics, currency and real property. I submit this Affidavit in support of the attached application for an order authorizing the installation and use of a pen register and trap and trace device, authorizing release of subscriber and other information, and authorizing the disclosure of location-based data. I set forth the following facts showing that there are sufficient grounds to believe that the cell-site and other subscriber records and information pertaining to telephone number **(956) 534-3886** with IMSI **310260452037028** (as defined in the Application and herein, the "**Target Device**") and records or other information identifying subscribers (but not including the contents of communications) for telephone numbers calling or receiving calls from the **Target Device** will likely be relevant and material to an ongoing criminal investigation. The **Target Device** is believed to be used by Monica **SANCHEZ** and is subscribed to Janet A. LUNA at McAllen, Texas:

a.  In June of 2006, the DEA CCRO along with the DEA Houston Field Office developed information regarding Homer **BALDERAS** arranging the transportation of a quantity of marijuana to Houston, Texas utilizing a tractor trailer. The DEA CCRO arranged to have the tractor trailer detained at the Falfurrias, Texas United States Border Patrol Checkpoint, which resulted in the seizure of 10,000 pounds of

2

marijuana and the arrest of Fabian **ESCOBEDO**. From May of 2006 through July of 2006, the CCRO received authorization to intercept the wire communications of Homer **BALDERAS** over several cellular telephones. On July 20, 2006, the DEA CCRO established surveillance at Homer **BALDERAS'** residence in Donna, Texas anticipating the delivering of a quantity of cocaine and currency. On July 21, 2006, based on the interception of Homer **BALDERAS**, the DEA CCRO seized 49 kilograms of cocaine and $223,000 dollars in United States currency. The seizure resulted in the arrest of Homer **BALDERAS**, Julio **PONCE** and Francisco **Aguirre-AMEZCUA**. The DEA CCRO also seized multiple properties and vehicles belonging to Homer **BALDERAS** as a result of the investigation.

      b.      Through the interception of Homer **BALDERAS** and his subsequent cooperation, the DEA CCRO identified Israel **SANCHEZ** as a significant marijuana and cocaine source of supply based in Mexico and the Rio Grande Valley of South Texas. The DEA CCRO has determined that the Israel **SANCHEZ** drug trafficking organization is responsible for the smuggling, transportation and distribution of multi-ton quantities of marijuana and multi-hundred kilogram quantities of cocaine to various locations throughout the United States including Houston, Texas, Atlanta, Georgia, Chicago, Illinois, Nashville, Tennessee and Miami, Florida. Special Agents from the DEA CCRO have determined that Israel **SANCHEZ** is the leader of an international drug smuggling and money laundering operation with considerable connections to high level drug traffickers in Mexico. The DEA CCRO has begun to identify members of the Israel **SANCHEZ** drug trafficking organization responsible for both the distribution of marijuana and cocaine as well as the laundering of drug

proceeds. The DEA CCRO has linked Israel **SANCHEZ** to multiple drug and currency seizures through the Title III wiretap and information obtained from cooperating defendant and confidential sources. To date, the DEA CCRO has seized or attributed approximately 60,000 pounds of marijuana and 500 kilograms of cocaine to the Israel **SANCHEZ** drug trafficking organization. Additionally, the DEA CCRO has seized or attributed approximately $1 million dollars to the Israel **SANCHEZ** drug trafficking organization.

    c.    The DEA CCRO has developed information regarding Monica **SANCHEZ** and her involvement with the Israel **SANCHEZ** drug trafficking organization. Multiple cooperating sources of information and cooperating defendants have stated that Monica **SANCHEZ** is the daughter of Israel **SANCHEZ**. According to reliable confidential sources of information, Monica **SANCHEZ** is actively participating in the money laundering aspect of the Israel **SANCHEZ** drug trafficking organization. Specifically, the DEA CCRO has developed information that Monica **SANCHEZ** transports currency derived from the distribution of narcotics by the Israel **SANCHEZ** drug trafficking organization. According to a source of information interviewed by your Affiant, Monica **SANCHEZ** is responsible for transporting large quantities of currency from the Rio Grande Valley of South Texas to Mexico. The currency is delivered to the Rio Grande Valley of South Texas from various locations throughout the United States at the direction of Israel **SANCHEZ** and his wife, Gloria **RUIZ-SANCHEZ**. Once the currency is delivered to locations controlled by Israel **SANCHEZ** in the Rio Grande Valley of South Texas, Israel **SANCHEZ** or Gloria **RUIZ-SANCHEZ** provide the currency to Monica **SANCHEZ** to be delivered to sources of supply located in Mexico.

The DEA CCRO conducted an inquiry involving Monica **SANCHEZ** entering the United States from Mexico. From February 8, 2007 through the present, your Affiant discovered that Monica **SANCHEZ** entered the United States through the Hidalgo, Texas Port of Entry on 6 occasions. Monica **SANCHEZ** also entered the United States through the Hidalgo, Texas Port of Entry on February 6, 2006 and December 27, 2006. During surveillance conducted by the DEA CCRO involving Monica **SANCHEZ** and Gloria **RUIZ-SANCHEZ**, Special Agents observed a 2007 Hummer H3 with Texas license plates 912-RRF. Texas license plates 912-RRF are registered to Monica **SANCHEZ** at 105 Gardenia Avenue in McAllen, Texas. A border crossing inquiry involving Monica **SANCHEZ'** Hummer H3 revealed that the vehicle entered the United States through the Hidalgo, Texas Port of Entry 8 times from January 2, 2007 to the present. These types of border crossings by Monica **SANCHEZ** and her vehicle are consistent with an individual who is transporting currency from the United States into Mexico as described by the source of information.

    d.    The DEA CCRO also contends that Monica **SANCHEZ** is involved with other money laundering activities related to the Israel **SANCHEZ** drug trafficking organization. The DEA CCRO has determined that Israel **SANCHEZ** utilizes **DON JUAN'S RESTURANT** in McAllen, Texas to launder the proceeds from the distribution of narcotics. **DON JUAN'S RESTURANT** is incorporated under the name of **CHUCHOS RESTAURANT BAR, LLC** and Gloria **RUIZ-SANCHEZ** is listed as the President of **CHUCHOS RESTAURANT BAR, LLC**. The DEA CCRO believes that Monica **SANCHEZ** is actively involved with laundering the proceeds from the distribution of narcotics through **DON JUAN'S RESTURANT** and **CHUCHOS**

RESTAURANT BAR, LLC. The DEA CCRO has discovered that checks are written to Monica SANCHEZ from the bank account of CHUCHOS RESTAURANT BAR, LLC that are endorsed and cashed by Monica SANCHEZ. For example, on April 5, 2007, a check for $10,000 dollars was written by Gloria RUIZ-SANCHEZ to Monica SANCHEZ from the bank account of CHUCHOS RESTAURANT BAR, LLC. After receiving the check, Monica SANCHEZ proceeded to cash the check written from the bank account of CHUCHOS RESTAURANT BAR, LLC. The following day on March 6, 2007, Gloria RUIZ-SANCHEZ provided Monica SANCHEZ with a check from the bank account of CHUCHOS RESTAURANT BAR, LLC for $500.00 dollars that was also cashed by Monica SANCHEZ. To date, Special Agents have discovered no documentation that indicates that Monica SANCHEZ is employed by DON JUAN'S RESTURANT or CHUCHOS RESTAURANT BAR, LLC. On May 31, 2007, Gloria RUIZ-SANCHEZ signed a check from the bank account of CHUCHOS RESTAURANT BAR, LLC for another $10,000 dollars that was provided to and cashed by Monica SANCHEZ. A further analysis of the bank account involving CHUCHOS RESTAURANT BAR, LLC reveals that Gloria RUIZ-SANCHEZ provides large quantities of money to several other individuals through checks that are cashed from the bank account of CHUCHOS RESTAURANT BAR, LLC. This type of financial activity is consistent with Israel SANCHEZ, Gloria RUIZ-SANCHEZ and Monica SANCHEZ utilizing DON JUAN'S RESTURANT and CHUCHOS RESTAURANT BAR, LLC to launder the proceeds from the distribution of narcotics.

2.  **Why Subscriber Records are Relevant & Material.** In my experience, information identifying the subscribers of telephone numbers calling to or from a

narcotics trafficker (and staying abreast of subscriber information associated with service/subscriber changes), has yielded information that is relevant and material to narcotics investigations. Such information includes investigative leads relating to:

- (A) the names of individuals associated with, and businesses relevant to, the trafficker;
- (B) the location of "stash-houses" and other locations pertinent to the investigation;
- (C) the identity of co-conspirators and sources of supply;
- (D) the locations of money transfers, modes and means of transportation, businesses used by the trafficker;

a. Based upon my training and experience, one of the most useful, undetectable and reliable ways to identify the foregoing information and to successfully investigate drug traffickers is to evaluate the pattern of calls made to and from the **Target Device** and to obtain information identifying subscribers for these calls and to then conduct an investigation concerning those individuals. Having the information related to subscriber information, would allow DEA Agents to understand the scope of Monica **SANCHEZ'** involvement with the **Israel SANCHEZ** drug trafficking organization.

b. Obtaining the subscriber name, address, date of birth, social security number, driver's license information, contact names and numbers, employment information; and method of payment is critical to accurately identifying such subscribers because, among other things:

- (A) if the subscriber name is a common one and/or the subscriber address is not current, it can be difficult to accurately identify the subscriber without a date of birth, driver's license, or social security number, especially in an

7

area with a population as large as the Southern District of Texas;

(B) if the subscriber name and address is fictitious, which frequently is the case when criminals and their associates purchase telephones, all or part of the remaining identification information may be truthful (such as the date of birth for prepaid phones) and may help identify the subscriber or lead to identifying other coconspirators;

(C) by accurately identifying subscribers using the above-requested information, agents can eliminate tangential individuals and businesses as surveillance or criminal intelligence targets and are permitted focus efforts on high-probability locations and persons.

(D) conducting interviews of persons who have had telephonic communication or personal contact with a trafficker is a fundamental investigative technique; and may unearth witnesses or informants willing to provide information that will assist in the success of the investigation.

3. **Cell Sites Disclose only the Location of an Antenna Tower.** Like plugging a conventional phone into a "wall-jack," the wireless telecommunications providers quickly and accurately detect which one of their "wall-jack" cell-sites is accessed by a mobile phone; and, armed with knowledge of that cell-site's physical tower location, agents can inferentially approximate the **Target Device's** location, at best to within several square miles, at call beginning and end. This approximated location can be used to corroborate the observations of surveillance agents and to anticipate future movements and locations by establishing the trafficker's habits or

patterns.

4.  **Locating the Phone Instead of the Tower.** While the information acquired by cell-site analysis (which is created and stored in the ordinary course of business each and every time the mobile phone makes or receives a call) can be coarse and non-specific,[1] information obtained from the telecommunications providers using their "Enhanced 911" tools, such as GPS fixes, triangulation, cell-site "pings," received signal strength indicator (RSSI), and timing offset analysis (Doppler-type measurements) can be much more precise in getting investigators closer to the actual handset. Some of these E-911 tools are not records that exist in the ordinary course of business and often are not created unless the user of the phone dials "911." Thus, unless a provider has reason to believe a mobile phone's user is in distress (typically by virtue of a 911 call), telecommunications providers will require a court order to create, record and disclose these electronic records to law enforcement. The DEA CCRO investigation involving **Israel SANCHEZ** has revealed that Monica **SANCHEZ** transports currency from the United States to Mexico at the direction of Israel **SANCHEZ**. There is also reason to believe that Monica **SANCHEZ** transports currency from Houston, Texas to the Rio Grande Valley of South Texas prior to being imported

---

[1] Based on multiple conversations with my agency's electronic surveillance experts, my own investigative experience and physical observation of cellular antenna towers, I know that most cell-sites have three sides, or sectors. Most cell-sites in urban areas, such as the densely-populated City of Houston, have an average footprint range, or coverage area, of two (2) miles from the tower. Using basic algebra, Pi * Radius$^2$ equals approximately 12 square miles. Divided by three (unless the antenna is omni-directional, or no-sided, in which case we wouldn't divide), this yields an average investigative focus area of four (4) square miles. For rural towers, many of which are omni-directional, the average footprint extends out to eight (8) miles, or 200 square miles.

into Mexico. This is supported by the fact that Monica **SANCHEZ'** vehicle, a Hummer H3 has traveled northbound and southbound through the Falfurrias, Texas United States Border Patrol Checkpoint on several occasions. From February 11, 2007 to the present Monica **SANCHEZ'** Hummer H3 has traveled through the Falfurrias, Texas United States Border Patrol Checkpoint on 6 occasions. The dates of travel through the Falfurrias, Texas United States Border Patrol Checkpoint by Monica **SANCHEZ'** vehicle are consistent with travel to Houston, Texas for the purpose of transporting currency. For example, Monica **SANCHEZ'** vehicle traveled northbound through the checkpoint on May 19, 2007 only to return southbound through the checkpoint on May 21, 2007. On February 16, 2007, Monica **SANCHEZ'** vehicle traveled northbound through the checkpoint and returned southbound through the checkpoint on February 19, 2007. Your Affiant believes that tracking the location of the **Target Device** will assist Special Agents with establishing surveillance on Monica **SANCHEZ**. Surveillance conducted on Monica **SANCHEZ** will assist Special Agents with gathering information relevant to the investigation. Furthermore, Special Agents anticipate utilizing the location of the **Target Device** to seize any currency that Monica **SANCHEZ** will be transporting. For example, Special Agents can monitor cell site information regarding the **Target Device** to determine when Monica **SANCHEZ** is traveling to Houston, Texas. Once Monica **SANCNEZ** arrives in Houston, Texas, Special Agents can obtain the GPS location of the **Target Device** to establish surveillance on Monica **SANCHEZ**. Once surveillance is established on Monica **SANCHEZ**, Special Agents can attempt to seize any currency that is transported from Houston, Texas to the Rio Grande Valley of South Texas. Special Agents believe that seizing currency from Monica **SANCHEZ** can directly be

related to the Israel **SANCHEZ** drug trafficking organization and thus assist with achieving the goals of the investigation. The ability to monitor the **Target Device** with the type of precision offered by the various Enhanced 911 Tools employed by telecommunications providers will greatly increase the DEA CCRO Special Agents ability to locate, identify and gather intelligence about Monica **SANCHEZ** and other co-conspirators in the Drug Trafficking Organization. Additionally, this resource will allow DEA CCRO Special Agents to conduct surveillance on Monica **SANCHEZ** and her co-conspirators reducing the likelihood of being detected. I seek a probable-cause based order to require the creation and to compel the disclosure of these records. These records, however, are never so precise as to establish the phone's presence in a particular house or apartment and cannot be relied upon as a sole basis for attempting warrant service at any particular location.

5.  **No Device Installed, Time of Implementation Uncertain, & Delayed Notice.**

Whether we receive real-time cell sites or request the provider disclose E-911 location information, no government "device" is involved. Rather, cell-site records are passed contemporaneously with pen register and trap and trace data from the accessing cell site to the local Mobile Telephone Switching, which forwards the information to the Provider's central collection facility (i.e. their law enforcement relations/court order bureau offices). From there, the provider authorizes the data stream for release to the Investigative Agency through its CALEA-compliant network.

a.  Similarly, when we request E-911 tools in an attempt to locate the physical handset, no government "device" is used. Rather, the provider will query the

11

phone, which must be on, to ascertain its location through a two-way data dialogue. That information is captured and stored by the provider and passed on to the Investigative Agency orally or in writing (e.g. email or fax).

b. Once I receive an order for the type of information requested herein, it is served upon the **Target Device's** Provider. Once received, it is catalogued and assigned to an electronic surveillance representative, who, based on caseload, will "provision" the **Target Device** for delivery in the appropriate "switches," thereby instruction those switches to forward the information to the Provider's central collection point. "Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the Provider. Thus, the Investigative Agency cannot control whether the Order will be electronically implemented during day or night.

6. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on October 29, 2007, in Corpus Christi, Texas.

---
Patrick Hartig
Drug Enforcement Administration
Corpus Christi, Texas

---
Brian L. Owsley
United States Magistrate Judge
Southern District of Texas